# IN THE

# UNITED STATES DISTRICT COURT
## District of Connecticut

Oluwashina Kazeem Ahmed-Al-Khalifa
a.k.a Oluwashina Ahmed

(A0705306 20)

(Petitioner)

Jury Demanded By Trial

3:13-cv-272 CSH

v.

-Minister for Justice, Equality and Law Reform, Ireland
-Governor of Cloverhill Prison, Ireland
-Governor of Wheatfield Prison, Ireland
-Ryain Airline, Ireland
-Nigeria High Commission, Ireland
-Secretary of State for the Home Department, United Kingdom
-Newport Central Police Station, United Kingdom
-Campsfield House Immigration Removal Center, United Kingdom
-Dover Immigration Removal Center, United Kingdom
-BMI( British Midland International) Airline, United Kingdom
-Ducth Immigration and Naturalization Service, Netherlands
-Detentie Centrum Schipol Post, Netherlands
-Director General for Immigration, Spain
-Nigeria Immigration Service, Nigeria

(Respondents)

2013 FEB 26  P 1:42   U.S. DISTRICT COURT   NEW HAVEN, CT   FILED

# **COMPLAINT**

**Article 14 of the Universal Declaration of Human Rights** provides: (1) Everyone has the right to seek and to enjoy in other countries asylum from persecution. (2) This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations

1

*Article 18 of the Charter of Fundamental Rights of the European Union states*:
"The right to asylum shall be guaranteed with due respect for the rules of the Geneva Convention of 28 July 1951 and the Protocol of 31 January 1967 relating to the status of refugees and in accordance with the Treaty on European Union and the Treaty on the Functioning of the European Union (hereinafter referred to as 'the Treaties').."

An alien is entitled to a fair hearing before being deported and there must be substantial evidence to support deportation warrant. U.S. ex rel. Consular V. Karnuth, D.C.N.Y. 1939 27F Supp. 461, affirmed 108 F.2d 178. See also, Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms

Article 47 (Right to an effective remedy and to a fair trial) of The Charter of Fundamental Rights of the European Union states: "Everyone whose rights and freedoms guanranteed by the law of the Union are violated has the right to an effective remedy before a tribunal in compliance with the conditions laid down in this Article".

## Issues:

My unlawful transfer between four European Union States namely, United Kingdom, Ireland, Netherlands and Spain in the process of my application for an Asylum, Subsidiary and Humanitarian Protection in the aforementioned European Union States which resulted to my deportation to Nigeria after series of persecution violates International Treaties and Fundamental Rights.

## Jurisdiction

Jurisdiction is proper pursuant to The Alien Tort Statue(28 U.S.C # 1350, ATS, also called the Alien Tort Claim Act(ACTA)) is a Section of the United States Code that reads. "The District Court shall have original jurisdiction in any civil action by an alien for a tort only, committed in violation of the Law of Nations or a treaty of the United States." This Statue is notable for allowing U.S. Courts to hear human-rights cases brought by foreign citizen for conducts committed outside the United States.

The Torture Victim Protection Act(TVPA), passed and signed into law by President George H.W.Bush in 1992, gives similar rights to U.S. citizen and non-

citizen alike to bring claims for torture and extrajudicail killings committed in foreing countries.

Alien Tort Statue cases was vindicated by the U.S. Supreme Court. In its 2004 ruling in Sosa V. Alvarez-Machain, the Court held that the ATS grants federal courts jurisdiction over claims based on specifically defined, universally accepted and obligatory norms of international law. In establishing this standard, the Court effectively gave the green light to use the ATS as a means of redress for severe human rights abuse.

United States v. Libellants and Claimants of the Schooner Amistad, 40 U.S.518(1841).

Cabello v. Fernandes-Larios 402 F.3d 1148(11th Cir. 2005)

## Argument

The Law relied upon to Extradite me from the United Kingdom to Ireland, from Ireland to Netherlands, from Netherlands back to Ireland, from Ireland to Spain, from Spain to Nigeria violates Treaties or Fundamental Rights and therefore should be annulled.

*The Law : Council Regulation (EC) No **343/2003** of 18 February 2003 establishing the criteria and mechanisms for determining the Member State responsible for examining an asylum application lodged in one of the Member States by a third-country national.*

*The law also enables Member States to transfer asylum seekers to the first EU Country they entered.*

**Treaties being violated** : **(A)** Convention And Protocol Relating To The Status of Refugees **(B)** Council Directives 2004/83/EC of 29 April 2004 **(C)** United Nation Vienna Convention on Consular Relations **(D)** United Nation Convention Relating to the Status of Stateless Persons. **(E)** United Nations Convention Against Torture.

**Fundamental Rights being violated** :

A)  Universal Declaration of Human Rights.

B)  International Covenant on Civil and Political Rights.

3

C)  Convention for the Protection of Human Rights and Fundamental

D)  Charter of Fundamental Rights of The European Union.

E) International Covenant on Economic, Social and Cultural Rights

F) Declaration on Race and Racial Prejudice Adopted and proclaimed by the General Conference of the UnitedNations Educational, Scientific and Cultural Organization at its twentieth session, on 27 November 1978.

G) Convention on the Rights of the Child.

F)  Human Rights Act 1998

The aforesaid arbitrary law also violates the following Treaties and Fundamental Rights:

1.  American Convention on Human Rights "Pact of San Jose, Costa Rica"
2.  U.S. Constitution
3.  African Charter on Human and Peoples' Rights
4.  1689 Bill of Rights
5.  Canadian Charter of Rights and Freedoms


## Statements of fact

A.) I entered the United kingdom with a Visiting visa on August 2007.

B.) I thereafter relocated to Ireland where I applied for asylum in 2008 (case no. 69/2321/08). After my asylum application was refused by the Office of Refugee Application Commissioner (ORAC), the case was then referred to Refugee Application Tribunal (RAT) where same was refused. **Mary Trayers and Brian Trayers of Trayers and Company Solicitor,** 29-30 Ushers Quay Dublin 8 Ireland took over my case. Counsel promised to appeal the decision of RAT, there was no appeal filed. Instead, Counsel applied for Subsidiary Protection: Humanitarian Protection and Leave to Remain to the Minister of Justice. (**See Court of Justice of The European Union in Case C-465/07. Press Release No 15-09 17 February 2009 Writ Granted**). However, when the Minister made a deliberation on my case, I was not given an oral hearing, the right to present evidence and witnesses and I was not afforded the right to appeal the decision of the Minister. Counsel

promise to file for Judicial Review on my application for Subsidiary Protection, there was no Review filed.

C.) I then relocated back to the United Kingdom on September 2009 where I applied for International Protection on or about 30th of March 2011(case no. A1334237). I was provided with a NASS accomodation by the UK government upon tendering my application for Protection at No. 84 Dolphin Street, Newport NP20 2AR Wales.The United Kingdom government thereafter erroneously translated my application of Protection into an Asylum application and treated it as such.

D.) In the United Kingdom, I was represented by **Sarah Barwick of Albany Solicitor** 168 Richmond Rd Roath Cardiff CF24 3BX UK. She was an appointed Legal Aid Solicitor by the Welsh Refugee Council to handle my case. When I visited her in May 2011, she advised me that my case is being transferred to Third Country Unit (TCU,Team 4) of the UKBA Cardiff. That the office will make a decision if my application will be treated in the UK or I will be sent back to Ireland in accordance with the Dublin Convention/Council Regulation(EC)No 343/2003 of 18 February 2003. She advised that the decision is subject to appeal and that I am entitled to two forms of appeal according to UK law.  She further advised that I will not be removed from the UK until all my appeal rights are exhausted. However, when I went for my monthly reporting at the Newport Central Police Station, I was arrested by the UKBA enforcement team and taken to Campsfield House Detention Center in Oxford in July 2011. I was not notified of the outcome of my application by the UK Border Agency untill the 15th of July 2011 when the refusal letter to this effect was later faxed to me at Campsfield House IRC upon my persistence that I wanted to know the reason for my detention. The aforesaid refusal letter did not bear my NASS accommodation's  correspondence address in Newport and does not contain the certificate of appeal which was erroneously claimed to have contained. (See article 9 of the International Covenant on Civil and Political Rights).

E.) I challenged the issued Removal Directions to Ireland through the High Court proceedings which was refused (without affording me with the opportunity to escalate my case to the Court of Appeals of the United Kingdom), I was thereafter relocated to Dover Immigration Removal Center after a failed attempt to remove me to Ireland in July 2011.

F.) While at Dover IRC, I submitted an application for Subsidiary Protection. Again, this was refused without affording me any right of appeal.

G.) Further at Dover IRC, I applied for Humanitarian Protection. Said application was never responded to by the UK government which served me with a second Removal Directions to Ireland in July 2011.

H.) I consequently lodged a Judicial Review claim to the High Court asking the Court to stop my removal to Ireland and, within the same application, I applied for Humanitarian Protection using the interpretation of Court of Justice of the European Union on Subsidiary Protection. The High Court refused my claim and I was consequently deported to Ireland on August 2, 2011. I was not, again, allowed the opportunity to escalate my case to the Court of Appeal in the UK before I was extradited by the UK government to the Ireland. It should be noted that the same High Court in the UK which ruled that the removal of asylum seekers to third country is incompatible with the European Convention on Human Rights  failed to apply this same ruling in my case but instead allowed my removal to a third country Ireland. I can also confirm that detainees such as Saeedi ( see Saeedi v. Secretary of State for the Home Department), ZH Tanzania (see ZH Tanzania vs. Secretary of State for the Home Department) had their respective cases heard up to Court of Appeal and Supreme Court of the United Kingdom respectively.

I.) Counsel failed to file an appeal in my case until I was extradited back to Ireland on 02/08/2011 by one Security and Escort Company via BMI (British Midland International) Airlines. I was escorted into the aircraft through the back door. **See Article 16,31,32,33 of the Geneva Convention. See also Article 47 of The Charter Of Fundamental Rights Of The European Union. See also Articles 19,20 of The Council Regulation(EC)No.343/2003 of 18 February 2003.** I was never afforded the opportunity to appeal the decision of the United Kingdom's Home Secretary who had wrongfully substituted my Protection application for an Asylum application

J.) In Ireland, I was incarcerated at Cloverhill prison with local criminals, a practice which I believe violates article 10 of the International Covenant on Civil and Political Rights.  A Habeas Corpus was filed by a Counsel in my behalf and this was granted by the Court which ordered my release. I was released and re-arrested immediately after stepping out of the Court's premises and returned back to the Cloverhill prison.

K.) Further, while I remained incarcerated at Cloverhill prison, there was a High Court landmark rulings ordering all asylum seekers released from prison. The prison authorities released me along with other detainees accordingly and, again, I

was re-arrested on the spot just after coming out of the prison's gate and returned to the prison.

L.) My letter from the European Court of Human Rights (ECHR) was deliberately delayed by the Cloverhill prison authorities until the due date requested by the ECHR for me to make my submission to the Court. I reported this abnormalis to my Counsel, **Trayers & Company**, who promised to lodge a Judicial Review at the High Court on 09/09/2011. There was no judicial review filed by counsel!

M.) I was deported to Netherlands on 09/09/2011 by the Irish authorities, via Ryain Air, where I applied for asylum ( **case no. V-2759821316**). I remained in mandatory detention at Detention Centrum and two other prisons in Netherlands until 30/11/2011. The decision rendered to my application for asylum was written in a language which I did not understand and never explained to me. Again, I was not allowed any appeal. Also in Netherlands, I lodged application for Humanitarian Protection using the Court of Justice Interpretation on Subsidiary Protection to which I received no response.

N.) In Netherlands,I was represented by **Mr.W.M Blaauw of Blaauw Advocaten Schotersingel** 153,2023 AD Haalem Netherlands. Mr. Blaauw represented me at my court hearing. Counsel was only seeking compensation for my unlawful detention, but he was not challenging my deportation back to Ireland. I requested that the hearing be conducted in English, the language that I understand but this was denied as one of the female judges stated that the law only permits the hearing to be conducted in the Dutch language. Then in protest, I requested for a copy of the law that mandated my hearing to be conducted in the language which I can not understand or speak. However, this was turned down by one of the judges who was adamant that the hearing has to be conducted in the Dutch language. It should also be noted that all my applications in the Netherlands were all conducted in Dutch language.

O.) I argued that sending me back to Ireland will be contrary to the Geneva Convention. The Judge failed to stop my deportation to Ireland, but Counsel was informed about the right to appeal the decision of the Judge, but my counsel failed to appeal the said decision even at my persistence demand for same. His failure to lodge an appeal contributed to my deportation to Ireland.

P.) While still in detention,before my deportation to Ireland, another counsel of record handled my application for temporary residence who advised that government has decided to give me Residence Status in the Netherlands. I was

thereafter provided with the application for temporary residence which I completed and sent back to my counsel. I did not receive any communication in response to the said application any longer. During this very period of my Counsel's inaction, I was deported back to Ireland via Ryain Airline.

Q.) Also in Netherlands, I requested for consular assistance from Turkey and Greece and my applications were not responded to.

R.) On 30 November 2011, the Irish officials came to the Netherlands to extradite me back to the Ireland. This extradiction was also executed via Ryain Air. I was shackled all the way to the soil of Ireland and then incarcerated at Wheatfield prison with local criminals, a practice which I believe violates article 10 of the International Covenant on Civil and Political Rights. I was held at Wheatfield prison in Ireland without due process-There was no court's proceedings initiated while being held at the prison. **(See International Commission of Jurists July 2011. Non-refoulment in Europe after M.S.S V Belgium and Greece. See Article 9,21 of the Council Directive 2004/83/EC of 29 April 2004. See also Article 3 of The United Nation Convention Against Torture.**

S.) I also requested for Consular Assistance from the United State Embassy, British High Commission, Canadian High Commission and Saudi Arabia Consulate through the NAN, a Christian Charity Organization in prison that assists prisoner with their correspondences. There was no response to my request. I was held at Wheatfield prison in Ireland without due process-There was no court's proceedings initiated while being held at the prison. **See Article 47 of the Charter of Fundamental Rights of the European Union.** After two weeks of incarceration, I was deported alongside others with a **Chartered flight** from Ireland to Spain. At Wheatfield Prison, I was manned by about ten escorting officers who refused to allow me to take any of my properties which contain all my legal papers and other items. (See article 17 of the Universal Declaration of Human Rights). In Spain, I was put in a different chartered flight containing the Irish, Spanish, German, Australia officials to Nigeria. (See Article 19 of the charter of Fundamental Rights of The European Union and Article 4 protocol No. 4 to the Convention for the Protection of Human Rights and Fundamental Freedoms). I arrive Nigeria deported on 16/12/2011 *without my legal papers and other properties.*

T.) After my deportation of 16th December 2011 to Nigeria, I contacted the Speaker of the House of Common (United Kingdom) for intervention in my case in regards to my fundamental rights that were violated by the United Kingdom

government but to no avail. I also contacted the Crown Prosecution Service for its intervention and again, yielded no positive result. I also contacted both the High Court and the Supreme Court of Ireland to no avail.

U.) I thereafter contacted my United Kingdom's Member of Parliament, **Paul Flynn**, in my request for Parliamentary investigation. I received a negative response to my request.

V.) Please note that I was all the way being moved around the countries of the European Union without a passport or any valid travel documents to justify same. I had seen three Emergency Travel Documents (ETD) allegedly issued by the Nigeria Government in my name in the past 9 years, none of which I gave my consent to.(See article 36 of Vienna Convention on Consular Relations). However, I note that a particular ETD given to me in Netherlands, upon my demand, by the Irish Officials bears the same number (23440) as the one used in my deportation from the United States in June 2002. Thus, my prison number in Ireland (73356) which I believe suppose to appear on the ETD did not!

W.) Upon my arrival in Nigeria, I also noted that Nigeria had issued another ETD to the Irish government to deport me from Ireland via Spain to Nigeria. In the said ETD which I saw at the Airport in Nigeria, it is stated within that I was living in Ireland illegally. However, this is not true as I was a Refugee Applicant throughout my stay in Ireland.

X.) In my effort to ascertain the validity of my deportation, I went to the Nigeria Immigration Service located at Alagbon, Ikoyi, Lagos here in Nigeria to request for a copy of the Travel Certificate which was used to effect my deportation to Nigeria in 2011. The attending Immigration Officials refused to provide any assistace but instead threatened me with detention if I fail to leave their premises.

Y.) It is my submission that the various unlawful acts perpetrated against me constitute an act of a War Crime under 18 U S C subsection 2441.The US War Crimes Act (1996) provides:

The term ''war crime'' means any conduct –

1) defined as a grave breach in any of the [1949 Geneva Conventions], or any protocol to such convention to which the United States is a party;

2) prohibited by Article 23, 25, 27, or 28 of the [1907 Hague Regulations];

3) which constitutes a violation of common Article 3 of the [1949 Geneva Conventions], or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or

The US War Crimes Act (1996), as amended by the Military Commissions Act (2006), which was passed by Congress following the Supreme Court's decision in *Hamdan v. Rumsfeld* in 2006, changed the definition of "war crime" in relation to common Article 3 of the 1949 Geneva Conventions.

**Common Article 3 Violations is described as follows:—**

(1) **Prohibited conduct.—** In subsection (c)(3), the term "grave breach of common Article 3" means any conduct (such conduct constituting a grave breach of common Article 3 of the international conventions done at Geneva August 12, 1949), as follows:

(A) **Torture.—** The act of a person who commits, or conspires or attempts to commit, an act specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control for the purpose of obtaining information or a confession, punishment, intimidation, coercion, or any reason based on discrimination of any kind.

(B) **Cruel or inhuman treatment.—** The act of a person who commits, or conspires or attempts to commit, an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control.

Basis for the war crimes listed above

These are violations of customary international law, listed as war crimes in the Statute of the International Criminal Court.
Other serious violations of international humanitarian law committed during a non-international armed conflict are described as follows:

• **torture or inhuman treatment, including biological experiments;**
• willfully causing great suffering or serious injury to body or health;

• extensive destruction or appropriation of property, not justified by military necessity and carried out unlawfully and wantonly;
• willfully depriving a prisoner of war or other protected person of the rights of a fair and regular trial;
• **unlawful deportation or transfer;**
• **unlawful confinement**;
• slavery and deportation to slave labor;
• collective punishments;
• the practice of apartheid or other inhuman or degrading practices involving outrages on personal dignity based on racial discrimination;
• violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
• committing outrages upon personal dignity, in particular humiliating and degrading treatment;
• **seizing property of the adverse party not required by military necessity**;
• making civilian objects the object of attack;

Similarly**, Article 147 of the Fourth Geneva Convention** which defines war crimes as: *"Willful killing, torture or inhuman treatment, including...willfully causing great suffering or serious injury to body or health**, unlawful deportation** or transfer or unlawful confinement of a protected person, compelling a protected person to serve in the forces of a hostile power, or **willfully depriving a protected person of the rights of fair and regular trial**,...taking of hostages and extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly."*

## Case Laws :

## Due Process Clause

Liberty under the Due process Clause includes protection against unlawful or arbitrary personal restraint or detention. See  Zadvydas v. Davis 121 S. Ct. 249; 150L.Ed.2d 653, 2001

It is well established that alien have due process right under 5th Amendment. See Reno V. Flores 507 U.S. 292, 306, 123 L. ED, 2d 113 S. Ct. 1439 (1996); Chi Thon Ngo V. INS, 192 F.3d 390,396 (3rd Cir. 1999).

The Due Process Clause of the Fifth Amendment States that "no person......shall be deprived of life, liberty or property without due process of law" . U.S. Constitution Amendment V.

As its protection extends to all "person" within the border of the United States, it encompasses deportable alien such as the petitioner. See London V. Plasecia, 459 U.S. 21 32-3374 L. Ed 2d 21, 103 S. Ct. 321 (1982); See also United States V. Balsys 524 U.S. 666, 671,141 L.Ed. 2d 575, 118 S. Ct. 2218 (1998) (holding that "resident aliens........are considered "persons" for the purposes of the Fifth Amendment and are entitled to the same protections under the (Self-incrimination) Clause as Citizens". ( Citing Kwong Hai Chew V. Colding, 344 U.S. 590, 596 97 L.Ed- 576, 73 S. Ct. 472 (1953))); Wong Wing V. United States, 163 U.S.228, 238, 41 L.Ed. 140, 16 S. Ct. 977 (1896) (holding that "person within the United States (and) even aliens..........(may not) be deprived of life, liberty or property without due process of law").

The Fifth Amendment also create a procedural due precess right(which extends to alien in deportation or removal proceeding) to be heard at a meaningful time and a meaningful manner, before a deprivation of liberty occurs. **Mathew V Eldrigde, 424 U.S. 319 334(1976); Patel V Zemski No. 01-2398,2001 U.S. App. LEXIS 26907 (9th Cir.Jan.,2002);Zadvydas V Davis, 533 121 S.Ct 2491(2001)**

## Subsidiary Protection

In Meki Elgafaji and Noor Elgafaji V Stactsseretaris van Jusices Netherlands.

Judgement of the Court of Justice of the European Union. Case C-465/07. Press Release No. 15/09. 17 Feb, 2009. (Writ Granted).

The Court held that an applicant for Subsidiary Protection ( Humanitarian Protection) does not necessarily have to prove that he is specifically targeted in his country of origin by reason of factors particular to his circumstances.

*The degree of indiscriminate violence in the applicant's country of origin can exceptionally suffice for the competent authorities to decide that a civilian, if returned to his country of origin, would face a real risk of being subject to serious and individual threat.*

**Prove Particular to My Circumstaces**

There are substantial evidence to show that the Ireland, United Kingdom, Netherlands, Spain and Nigerian violated the treaties and fundamental rights duly accorded to me.

**Factors Particular To My Circumstance**

a. Extreme Hardship   b. Persecution  c. Severe Economic Hardship d. Unusal and Social Hardship e. Exceptional Circumstances f.  Emotional Torture

**Extreme Hardship**

In Solorzano-Patlan v. INS_, F.3d_,2000 App. LEXIS 3641( 7th Cir. March 10, 2000). Establishin the basic factors to be considered indetermin the existence of "extreme hardship"------------and the economic and political conditions in the country to which the alien may be returned.

These factors were derived from a discussion in a committe report in the 9th Congress on Section 4 of  H.R. 8713 a bill which would have provided  for discretionary adjustment of status for certain aliens whose deportation would result in "unusual hardship".

The Board has held that Extreme Hardship is not a definable term of fixed and inflexible meaning, and that the elements of  establishing Extreme Hardship are dependent upon the facts and circumstance of each case. See matter of Chumpitazi, 16 & N December b 29  ( BIA- 1978). Each case must be carefully evaluated, and all possible hardship factors must be weighed together. See Turri V. INS, 997 F.2d 1306 (10th Cir. 1993) Hernandez-Cordero V. INS, 819 F.2d 558, 563(5th Cir. 1987); Prapavat V. INS, 662 f.2d 561(9th Cir. 1981).

**Rule of Lenity**

Contrary to the INS's assertion,the rule of Lenity, applies not only in criminal law but also in the immigration context because  deportation is such a harsh sanction. See Fong Haw Tan v. Phelan,333 U.S.6,10 (1948). See also, Nazaronvna v. INS, 171 F3d 478, 484 (7th Cir. 1999 (Board's interpretation of "exceptional circumstances" required for failing to appear at the deportation hearing not given deference because that, interpretation deprived alien of right to participate at her hearing and constituted an abuse of discretion; United States ex  rel. Giglio v. Neelly, 208  F.2d  337,341 (7th Cir. 1953).

## Dublin Convention/Council Regulation (EC) No 343/2003 of 18th February 2003

Judgment of the Court of Justice of the European Union in the landmark case of Saeedi/NS(C411/10 and C-493/10) handed down on 21st December 2011.

The case concerned a challenge by Mr Saeedi to his trasnfer to Greece under the Dublin Regulation which enables Member States to transfer asylum seekers to the first EU Country they entered.

The Court held that a Member State is obliged to examine an asylum application if transfer would expose the applicant to a serious risk of a violation of fundamental rights.

The safe third country deeming provision is incompatible with EU Charter

The Grand Chamber of the Court of Justice of the European Union (CJEU) has delivered its judgement in the landmark case of Saeedi/NS(C411/10) deciding fundamental questions about Members States' obligations under the EU Charter of Fundamental Rights and whether the Charter binds the UK. 13 Member States intervened along with the European Commission, UNHCR, the Equality and Human Rights Commission, Amnesty International/AIRE. An Irish reference, ME, was joined with NS.

The Grand Chamber has also held that the controversial safe third country deeming provision in UK primary legislation is incompatible with EU fundamental rights and therefore contrary to EU law. The deeming provision prevented UK courts from declaring unlawful and quashing the removal asylum seekers to other EU Member States on the basis that defects in other EU states' asylum systems created a real risk of expulsion from the receiving state in violation of the Refugee Convention and EU law. ( In Nasseri, the Court of Appeal and House of Lords had reversed the declaration of incompatibility granted by the Administrative Court under the Human Rights Act in relation to the deeming provision.)

UK may not apply conclusive presumption that other Member States respect fundamental rights.

In M.S.S. v Belgium and Greece, the Court (European Court of Human Rights) states:

232. ... [ it did] not regard the duration of the two periods of detention imposed on the applicant – four days in June 2009 and a week in August 2009 – as being insignificant. In the present case the Court must take into account that the applicant, being an asylum seeker, was particularly vulnerable because of everything he had been through during his migration and the traumatic experiences he was likely to have endured previously.

233. ... in the light of the available information on the conditions at the holding centre near Athens airport, the Court considers that the conditions of detention experienced by the applicant were unacceptable. It considers that, taken together, the feeling of arbitrariness and the feeling of inferiority and anxiety often associated with it, as well as the profound effect such conditions of detention indubitably have on a person's dignity, constitute degrading treatment contrary to Article 3 of the Convention. In addition, the applicant's distress was accentuated by the vulnerability inherent in his situation as an asylum seeker.

**Article 3: living conditions**

Whilst Article 3 did not generally oblige Member States to secure for refugees a certain standard of living, the Court held in the light of the evidence that the situation in which *M.S.S* lived was particularly serious, and specifically that:

263. ... in view of the obligations incumbent on the Greek authorities under the European Reception Directive  (see paragraph 84 above), the Court considers that the Greek authorities have not had due regard to the applicant's vulnerability as an asylum seeker and must be held responsible, because of their inaction, for the situation in which he has found himself for several months, living in the street, with no resources or access to sanitary facilities, and without any means of providing for his essential needs. The Court considers that the applicant has been the victim of humiliating treatment showing a lack of respect for his dignity and that this situation has, without doubt, aroused in him feelings of fear, anguish or inferiority capable of inducing desperation. It considers that such living conditions, combined with the prolonged uncertainty in which he has remained and the total lack of any prospects of his situation improving, have attained the level of severity required to fall within the scope of Article 3 of the Convention

On top of the Court's damming findings it ordered Greece to pay 1,000 Euros to *M.S.S* and Belgium to pay a whopping EUR 24,900 in damages. All EU countries should now suspend removals to Greece pursuant to the Dublin II regulations.

## Medical Justice V. Secretary of States for the Home Department 02/07/07.

The High Court rules that the law on removals of asylum seekers to third countries is incompatible with the European Convention on Human Rights.

## INS V. Cardoza-Fonseca, 480 U.S. 421 1987.

The U.S. Supreme Court held that the High Commissioner's analysis of the United Nations' is consistent with our own examination of the origin of the Protocol's definition, 23 as well as the conclusions of [480 U.S. 421, 440] many scholars who studied the matter. 24 There is no simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured or otherwise persecuted, that he or she has no "well founded fear" of the event happening.

## Suresh v. Canada (Minister of Citizenship and Immigration), [2002] 1 S.C.R.

The Court ruled that when a refugee establishes a prima facie case that deportation may lead to toture, they are entitled to a higher degree of procedural protection than the Immigration Act stipulated.

## Customary International laws

The former Secretary of States, a reknown elderly Statesman of Jewish descent, vast in the Knowledge of what Torture is contrary to what Torture is as defined by the Convention Against Torture and what the Service has asserted it, is his address to the General Assembly of the United Nation, unequivocally defined Torture as follows:

Torture, "a practice which all nations of the world should abhor. TORTURE, it is an absolute debasement of the function of government when it overwhelming power is used not for people's welfare but as an instrument of their suffering".Dr. Henry Kessinnger.

Jefferson's immortal words will remain, and they will be preserved in human hearts even if this original parchment should fall victim to time and fate.

"We hold these truths to be self evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable rights that among these are

Life, Liberty and the Pursuit of Happiness. That to secure the Rights, Government are instituted among Men deriving their Just Power from Consent of the governed,...........

The search for Peace and Justice also means respect for human dignity. All the signatories of UN Charter, of which the Republic of Ireland, United Kingdom, Netherlands, Spain and Nigeria is a component pledged themselves to observe and to respect basic human rights.

The instance proceedings are civil and assumed no be nonpunitive, and Goverment proffers no sufficiently strong justification for indefinite civil detention under this Statue. Zadvydas V. Davis.

## Conclusion

Petitioner has suffered manifest injustice. To maintain the integrity of the federal judicial system, the Court must be concerned whether the parties received fair and impartial treatment of their claim. Draconian punishment of aliens, as compared to citizens, is based on formal legal status. It ignores the claims of all people, including aliens, to universal rights of "personhood." See Schuck, supra, at 202; see also Harry S. Truman's Inaugural Address of January 1949 ("Decent, satisfying life....is the right of all people"). Unusually cruel and harsh treatment of aliens is directly tied to their status as a relatively weak minority group. Such groups require diligent attention by Courts to ensure that their rights are not unnecessarily violated by the majority. See United States v. Carolene Products Co. 304 U.S. 144,152 n.4,58 S.Ct. 778,783 n. 4,  82 L. Ed. 1234,1241 n. 4(1938) (courts must be diligent to guard the rights  of "discrete and insular" minorities). Citing **Don BEHARRY v. Janet Reno No. 98 CV 5381(JBW) Jan. 22, 2002.** In the matter presently before the Court, justice demands that petitioner's writ be granted in order to restore impartiality to the litigant in the judicial process.

## RELIEF SOUGHT

Petitioner respectfully requests that all his properties including his legal papers be produced and provided to him accordingly. He is requesting to be adequately compensated for all the violations committed against him. He is also asking the Court to grant any other relief that it deems just and proper.

Petitioner believes that the law relied upon, **Council Regulation (EC) No 343/2003 of 18 February 2003**, to effect his transfers all along within the European Union States violates Treaties and Fundamental Rights and therefore should be annulled.


Respectfully submitted,

*Ahmed* 01/29/2013

Oluwashina Kazeem Ahmed-Al-Khalifa

**Address**: 5, Robert Onadipe Street
Gbagada  Phase 1, Shomolu Pedro
Lagos, Nigeria.

**Email:** oahmed005@yahoo.com

**Tel:** 00234 810 380 4404

**Signed:** _____*Ahmed*_____   **Dated:** 29 January 2013

Submitted with this petition are:                          Page No

1. Letter by the Department of Immigration, Netherlands          1
2. Letter by the Department of Immigration, Ireland          2
3. Letter dated March 15, 2012 received from the Secretary of Security
   and Justice, Netherlands on seized properties          3
4. Letter received from Amnesty International, Nigerian Newspaper
   Publication, Publication by 'Permanentrevolution', News publication by
   UK Indymedia, News publication from Medical Justice Network          4-13

**Ordemaatregel (art. 23/24 PBW)**

Informatie per 21/11/2011

*The only Document in the hand of the Claimant, received from the Netherlands. Prior to being Send back to Ireland on 30/11/2011*

*Ahmed*

| | |
|---|---|
| Gedetineerde | Ahmed, O. |
| Geboortedatum | 09/11/1969 |
| Cel | 009 |
| Afdeling | M OBS |
| Detentienummer | 7840138 |
| Inrichting | Detentiecentrum Oude Meer |

Hierbij deel ik u mede, uw gemoedstoestand in aanmerking genomen, dat u de volgende ordemaatregel is opgelegd:
14 dagen afzondering in afzonderingscel (art. 24.2 PBW)

Ingang: 21/11/2011 om 12:00 uur
Einde: 05/12/2011 om 12:00 uur

Deze beslissing is genomen op grond van de volgende overwegingen:
U bent gezien door een gedragsdeskundige en deze heeft mij gezien uw onvoorspelbare gedrag geadviseerd om u te plaatsen in een observatiecel.

Deze beslissing is mede genomen voor uw eigenveiligheid en dat van u mede ingeslotenen en het personeel.

Tevens om u goed te kunnen observeren plaats ik u onder cameratoezicht. Zodra cameratoezicht niet meer noodzakelijk is zal deze worden beëindigd.

Voor uw verdere verblijf zal ik mij laten adviseren door een aan deze inrichting verbonden gedragsdeskundige.

Indien van toepassing zal dagelijks door een gedragsdeskundige worden bekeken of de maatregel gehandhaafd dient te worden.

Deze ordemaatregel kan, indien noodzakelijk, verlengd of verkort worden.

Sancties en of maatregelen, opgelegd tijdens uw detentie kunnen van invloed zijn op uw v.i. datum.

Handtekening:

*The body ... claim" by villus*

U kunt schriftelijk in beklag gaan tegen deze beslissing binnen 7 dagen na de dag waarop u in kennis bent gesteld van deze beslissing. Uw klaagschrift stuurt u aan de secretaris van de beklagcommissie uit de Commissie van Toezicht bij deze inrichting,
In afwachting van de uitspraak van de beklagcommissie, kunt u de voorzitter van de beroepscommissieverzoeken om de tenuitvoerlegging van deze beslissing te schorsen. U schrijft dan naar: Raad voor Strafrechttoepassing en Jeugdbescherming, Voorzitter Beroepscommissie, Postbus 30137, 2500 GC Den Haag.

Uitgereikt door: ___NB___

Datum: _21/11/11_   Tijd: _14.15_

(1)

Registration ID: 551712



# An Garda    Síochána

# IMMIGRATION ACT 2004

To : **Mr Oluwashina Ahmed**

This is to inform the person to whom this notice is addressed that s/he is being refused permission to land in accordance with the provisions of the Immigration Act 2004 on the following grounds:

*F. That the non-national is the subject of - (i) a deportation order (within the meaning of the Act of 1999) or (ii) an exclusion order (within the meaning of that Act), or (iii) a determination by the Minister that it is conducive to the public good that he or she remain outside the State*

Subsequently, he has written a letter to the Minister of Justice in Ireland that he has withdraw his asylum application. Yet they wouldn't let go.

Signed : _____ (AC MICHAEL NEVILLE)
**IMMIGRATION OFFICER**

STAMP

Ahmed
22/12/2011
②

Date :   **30 November 2011**

* This is a letter given to the Claimant after he has left Ireland in Sept 2009. 3yr After his 1st Application.



**Dienst Justitiële Inrichtingen**
*Ministerie van Veiligheid en Justitie*

> Retouradres Postbus 30132 2500 GC Den Haag

Mr Oluwasluna Ahmed
5 Robert Onadipe Street
Gbagade Phase 1
Lagos
Nigeria

**Directie
Bestuursondersteuning**
Juridische Zaken

Schedeldoekshaven 101
2511 EM  Den Haag
Postbus 30132
2500 GC  Den Haag
www.dji.nl

**Ons kenmerk**
5727631/12/DJI

*Bij beantwoording de datum
en ons kenmerk vermelden.
Wilt u slechts één zaak in uw
brief behandelen.*

Datum       March 15, 2012
Onderwerp  Your letter of December 23, 2011

Dear Mr Ahmed,

With reference to your letter of December 23, 2011, in which you ask the return of your legal papers and personal items, I notice the following.

I don't have any of your belongings in manage. All your belongings, which I kept for you during your custody in the Netherlands, were given to the Irish officials who escorted you at your departure from the Netherlands.

I trust to have informed you sufficiently.

Yours Sincerely,

The Secretary of Security and Justice,
on his behalf,

R.W.M. van der Zon
*Head Legal Affairs*



**Subject:**  No one should die like this

**From:**  Amnesty International UK (sct@webmail.amnesty.org.uk)

**To:**  oahmed005@yahoo.com;

**Date:**  Thursday, July 7, 2011 7:34 AM

Having difficulty reading this email? View in a browser



**Follow us**

Twitter

Facebook

Dear Oluwashina,

Last October, my husband Jimmy Mubenga was put on a plane accompanied by three private security guards to be forcibly removed from the UK. We had lived in the UK for 16 years and our five children were born here.



Jimmy died during the removal process. I found out that his death was probably due to the dangerous and abusive techniques used to restrain him. **Before he died, witnesses on the plane heard Jimmy cry out that the guards were going to kill him.** No one should die like this. Please stop it from happening again.

The guards are under investigation for alleged manslaughter and are currently on bail. I am left struggling to bring up our five children without a father.

I would not want anyone to have to go through what our family is suffering. Yet there have been many other reports of people being injured while being removed from the UK. **If nothing is done it is only a matter of time before there is another death.**

To prevent this, I ask that you write to Home Secretary Theresa May urging her to make the system more humane. This must include proper training of staff carrying out removals, independent monitoring, and making private companies more accountable.

Please take this action in memory of my husband, Jimmy Mubenga.

Thank you,

Adrienne Makenda Kambana
(Jimmy Mubenga's widow)





# THE PUNCH

# Another deportee dies in Austria

**Theophilus Abbah with Agency reports**

SEVEN months after the death of citizen Semira Adamu during a forcible deportation from Belgium, another 25-year-old Nigerian (name not given) has died almost in similar circumstances.

The deportee, a male, died while he was being forcibly deported to Nigeria from Austria.

According to the Agence France Presse (AFP), quoting Austrian television reports on Sunday, the Nigerian deportee died aboard the plane that was flying him to Sofia, enroute to Lagos.

The report, quoting a statement by the Austrian Interior Ministry, said the three police officers accompanying the man bound his feet and hands and strapped his mouth with adhesive tape, to counter "significant and persistent physical resistance".

The ministry stated though that the police officers were careful not to block the deportee's breathing, adding that it "deeply" regretted the man's death.

The statement added that the ministry would investigate the circumstances surrounding the death and that it would temporarily suspend deportations.

The death of 20-year-old Semira Adamu in Belgium under similar circumstances, provoked a nationwide outcry over the degree of force used to expel illegal immigrants from European nations. The action led Brussels to suspend deportations and prompted its interior minister to resign.

In Nigeria, non-governmental organisations, under the aegis of the Nigeria Human Rights NGO Coalition on Semira Adamu, staged a peaceful protest at the Belgian Embassy in Lagos, calling for an end to forcible deportations and the associated violence, especially against women.



# permanentrevolution

"The workers... battle-cry must be: 'The Permanent Revolution.'" — Marx and Engels, 1850

## Racists at Cardiff UKBA – demonstrate this Friday (26th Feb)

The 2008 case of Ama Sumani, snatched from hospital in Cardiff and deported to Ghana where she subsequently died of myeloma, brought widespread attention to the barbarous practices of the UK Border Agency in Wales. It came as no surprise, then, when a temporary worker at the agency, Louise Perrett, revealed a sickening culture of racism at UKBA's centre on Newport Rd, Cardiff (see Guardian article).

It is time to let the cynical government stooges at UKBA know what we think of them. This Friday, 26th Feb (1-3pm) there will be a demo at 31-33 Newport Rd, called by Refugee Voice Wales and supported by a range of anti-racist groups and individuals.

The demo will demand:

a) all cases dealt by unscrupulous officers be reviewed

b) immediate suspension of all removals / deportations

c) the suspension of all corrupt staff and their supervisors

d) an instant independent overhaul of the whole system at Cardiff UKBA

e) an independent inquiry into all UKBA offices to uphold the Refugee Convention

Refugee Voice Wales asks all concerned people to spread the word and wear black gloves on the day for the freedom salute; the practices of the UKBA make a mockery of the inclusion and integration policies supposedly championed by the the Welsh Assembly.

Cardiff Radical Socialist Forum, in association with South Wales No Borders, discussed the wider issues behind immigration controls here.

http://cardiffpr.wordpress.com/2010/02/22/racists-at-cardiff-ukba-demonstrate-this-friday-26th-feb/

*Mon 22, February 2010 @ 16:01*



Skip to content or view mobile version

# UK Indymedia

Home | Mobile Version | Editorial Guidelines | Mission Statement | About | Contact | Help | Security | Support Us

A network of individuals, independent and alternative media activists and organisations, offering grassroots, non-corporate, non-commercial coverage of important social and political issues.

# Demo at Cardiff UKBA against Tete's deportation

Cardiff Against Deportations | 23.09.2010 23:06 | Migration

There will be a demonstration at the UK Border Agency in Cardiff Friday 24th Sept, 11am- 1pm against the deportation of Tete Wanda to DR Congo



Tete Wanda, who fled from the Democratic Republic of Congo in 2005 because of her political activities, was arrested when signing in at the UKBA reporting centre in Cardiff on Tuesday the 21 September. She has been detained at the Cardiff Bay Police Station and then moved to Yarls Wood Removal Centre on the 22nd. The UKBA has scheduled her flight to be on Tuesday the 28 September 2010 at 20.00 hrs. Join her campaign in demonstrating on 24 September against her removal and against all removals to the DRC!

Tete came into the UK on the 28th January 2005 after she has been a member of UDPS (Union for Democracy for Social Progress), a main political party in the DR Congo. Because of this she became a target to the Kabila's government through her political activities and was forced to leave the country on the 27th January 2005 and flee to the UK. Her asylum claim was rejected and became a failed asylum seeker on section 4 support until the day of her arrest. Even though she was one of the legacy cases, she has been arrested/detained for removal/deportation by the UKBA Enforcement.

Since seeking sanctuary in Wales, Tete has taken all possible steps to become proficient in English and has further, with DP1A and a local church's support, completed a Hospitality and Catering course from Coleg Glan Hafren during 2009-10. She has volunteered with Barnardo, Riverside Community Allotments, WRC and the Black Voluntary Sector Network Wales (BVSNW). BVSNW.



4/16/2012 8:37 AM

She has integrated extremely well in local Welsh community and was looking forward to receiving her refugee status to start a new professional life as a caterer. But the night before last events have changed it all. Her solicitors and other agencies (DPIA, WRC) are trying to get further information as to the reasons and also the removal date.

What can you do to help?

Demonstration for Tete and against deportations to the DRC
Friday 24 September 2010

Supporters are demonstrating tomorrow for her release as well as to demonstrate against any further deportation the DR Congo.

When: 11 am to 13.00 hrs

Where: in front of the UKBA Cardiff on 31-33 Newport Road , Cardiff , CF24 0AB.

A model letter will be available shortly.


Source: Cardiff Campaign Committee

End of Bulletin.


**Cardiff Against Deportations**

- Download this article in pdf format
- Email this article to someone;
- Submit an addition or make a quick comment on this article

Upcoming Coverage
> View and post events

Upcoming Events UK
> **12th - 29th April, across Wales:** Bradley Manning Support Events. More info here.
> **20th - 22nd April, Suffolk:** Camp and demo at Sizewell
> **April 22nd, Brighton** Oppose the March for England
> **April 25th, London** Confront Counter Terror Expo
> **May 1st to July 31st, Brighton** Smash EDO: Summer of Resistance
> **May 1st, Brighton** Big noise demo to launch the Summer of Resistance
> **May 17th-20th, Brighton** Squatters Convergence
> **27th May, Rothamsted, Harpenden, Herts** Take the Flour Back! Mass action against GM wheat
> **9th June for 30 days, Faslane:** 30 Days of Action at Faslane Naval Base
> **17th-24th June, Stockholm, Sweden** No Borders Camp, Sweden

Ongoing UK
> **Every Wednesday, Brighton:** noise demos at EDO MBM
> **Ongoing, Lincs:** RAF Waddington Peace Camp. Protesting against Drone Warfare. More info.
> **Ongoing, London:** Occupy London Stock Exchange



Home    Contact us    Get involved    About    search...

Home › News › Articles › Independent : "Airlines face 'direct action' threat in deportations row" - 09/10/07

**MAIN MENU**

Home

About us

Activities

Events

News

   MJ News

   Articles

Get involved

Resources

Training

Children

Habeas Corpus

Contact us

Links

Search

Site map

Library

## Independent : "Airlines face 'direct action' threat in deportations row" - 09/10/07

Posted by Emma Ginn

**Airlines face 'direct action' threat in deportations row**
By Cahal Milmo
Published: 09 October 2007

"Carriers including British Airways and Virgin Atlantic were under growing pressure yesterday to refuse to carry asylum-seekers being forcibly removed from Britain after activists threatened direct action over allegations that detainees are being abused.

The airlines were accused of profiting from the forced removals programme, which has given rise to a dossier of 200 cases where deportees have claimed physical and mental mistreatment by their British escort teams. The Independent can reveal that the Home Office paid British Airways more than £4.3m in 2006 to carry failed asylum-seekers and their escorts.

A succession of carriers insisted they were obliged by law to accept the passengers. The Home Office said its Borders and Immigration Agency, which is in charge of funding the removals, recognised the right of the captains of aircraft to refuse to carry a detainee for "security or commercial reasons".

Gordon Brown said the Government would not halt the programme, despite growing evidence that Britain is sending failed detainees to countries with repressive regimes. He said: "We have got to expel those people who come to our country but have got no justification being here."

More than 18,000 failed asylum-seekers were removed from Britain last year by air. One charter operator, XL Airways, became the first airline to reject the policy after it said last weekend that it was refusing such flights out of "sympathy for all dispossessed persons in the world".

The National Coalition of Anti-Deportation Campaigns (NCADC) said it would picket offices and launch a letter-writing campaign demanding that carriers halt the practice.

Emma Ginn, one of the group's founders, said: "The airlines do not sell these seats at a loss, they are profiting from this trade at a time when the reality of what takes place has been made clear." She said there should be no forced removals under such circumstances.

In the last two years, 1,173 attempts to remove failed asylum-seekers have been abandoned by their escorts. The Independent last week revealed the cases of Armand Tchuibeu and Beatrice Guessie, both from Cameroon, who said they suffered physical violence and, in the case of Mr Tchuibeu, racist abuse. Ms Guessie required hospital treatment for injuries including severe genital bleeding allegedly inflicted by her escorts after the Cameroonian authorities refused to accept her.

Each of the six airlines contacted by The Independent insisted yesterday that they are obliged under the 1971 Immigration Act to carry the detainees. None of the carriers was willing to provide details of the number of failed asylum-seekers they carry.

The Home Office said it expected escort staff contracted by the Border and Immigration Agency to act with "professionalism and integrity" and that any allegations of abuse would be fully investigation.

**'They took my trousers and tied my legs' - David, 37, Ugandan asylum-seeker**

Despite being tortured and imprisoned in Uganda before arriving in Britain two years ago, David was subjected to four removal attempts – one on a BA flight from London Heathrow to Entebbe in June 2005.

He suffers from high blood pressure and suspected epilepsy due to injuries received in prison. Describing how he was brought to the BA flight, he said: "I was in a van and handcuffed to be flown to Entebbe. I was not shown any documents. I was told I could speak to immigration. The handcuffs were too tight, they would not loosen them. After two hours they took me on to the plane. I resisted and screamed. They took off my trousers and tied my legs. They pushed me down and put a pillow over my mouth. The flight attendant advised them to seat me upright. Then she saw my wrists were bleeding. She talked to the captain, who told them to remove me. They dumped me in the van and drove me to Colnbrook [Detention Centre], handcuffed." Supporters say David's allegations were reported but no response has been given. He has been given temporary leave to remain in Britain."

© 2011 Medical Justice Network



4/27/2012 4:35 AM

http://www.medicaljustice.org.uk/general-information/65/236-harm-o...

Home   Contact us   Get involved   About   search...

Home › General information › General › Harm on Removal

RESOURCES MENU

Home
Case studies
Tools for doctors
Tools for visitors
Tools for detainees
Tools for ensuring rights
MJ Negotiation of policies
Information gathering
Legislation and policies
Migrant entitlements
MJ Reports, submissions, etc.
Parliamentary lobbying
General information
    Reports
    Statistics
Doctor's Handbook

MAIN MENU

Home
About us
Activities
Events
News
Get involved
Resources
Training
Children
Habeas Corpus
Contact us
Links
Search
Site map
Library

## Harm on Removal

Posted by Emma Ginn

Detainees who allege assault in the removals process call organisations for help daily - these calls represent just the "tip of the iceberg" because most assault allegations only come to light if the detainee has family, friends or visitors able to help them report the abuse.

Recent articles ;

**Independent :** "Inhumanity, hypocrisy, and a policy that shames Britain" - 05/10/07
**Independent :** 'It is easy to abuse when a victim is out of sight' - 05/10/07
**Independent :** "British guards 'assault and racially abuse' deportees" - 05/10/07
**Independent :** "Beaten, bleeding - and then returned in a wheelchair" - 05/10/07
**Independent :** "Airlines face 'direct action' threat in deportations row" - 09/10/07
**Independent :** "Deportation abuses 'should be investigated'" - 20/10/07



In 2004 an undercover journalist at Yarl's Wood reported GSL officers describing giving detainees a "good pasting" and how "brilliant" that was.

A GSL officer referred to detainee Ms A saying "She was taken into the Removal from Association area in case she started to 'play up'" and because "we had got intelligence on her". Ms A says she removed her clothes in protest and the officer described how "two males and a female went in and splattered her." (diagram left – Control & Restraint as described by Ms A). Ms A was taken to the airport and says the pilot refused to allow her and the immigration escorts to fly as she was still inadequately dressed and screaming in fear. Ms A is one of the relatively few detainees who was able to seek a legal remedy. She won her civil case against GSL and the Home Office.

In answer to a parliamentary question, the immigration minister revealed that detainees had made 71 allegations of "improper treatment" regarding immigration "escorts" in 2004. He added "all allegations were passed to police" and assured parliament that "All allegations of assault or inappropriate use of force" are "referred to the police as the appropriate authority to investigate such matters". However, Medical Justice knows of no successful criminal prosecutions against the Home Office and its sub-contractors.  In Ms A's case, the police brought no criminal proceedings against them, saying that her injuries were consistent with the use of standard Control & Restraint (C&R) procedures and that no further investigation was required.   The police did however charge Ms A with assault for biting an officer's hand.

In a report on 'Short Term Residential Holding Centres', the HMIP referred to "Recent evidence of abuse under escort and at the point of removal", noting that the Holding Centre "operates out of the sight of the community but unlike other custodial environments, with no regular independent monitoring."

Officers are allowed to use "reasonable force" during C&R.  The Prison Ombudsman reported in his April 2004 inquiry into racism and abuse by GSL staff at Yarl's Wood about the use of C&R on one female detainee ; "an officer twisted her neck and kept twisting her wrists and swore at her while another officer put his/her hand in her mouth so that she could not breathe". The Inquiry team viewed the CCTV and video footage of this incident and reported that: "It was clear that everything was done in line with proper procedures."

### "Harm on Removal: Excessive Force against Failed Asylum Seekers" by the Medical Foundation

The Medical Foundation for the Care of Victims of Torture produced a report "**Harm on Removal: Excessive Force against Failed Asylum Seekers**" on 14 cases where deportees alleged abuse medical evidence indicated that in 12 out of the 14 cases, excessive or gratuitous force had been used during an attempt to remove them from the UK.

### An analysis of 35 cases

An analysis of 35 cases referred to four solicitors' firms revealed that injuries sustained by deportees during removal attempts ranged from cuts, bruises and swellings, to nerve damage, urethra/groin damage, fractured bones to sexual assault. Many of these cases have since been settled out of court.

Last Updated on Tuesday, 01 January 2008 18:32

© 2011 Medical Justice Network



4/27/2012 4:36 AM

Home    Contact us    Get involved    About    search

Home

**MAIN MENU**

Home

About us

Activities

Events

News

Get involved

Resources

Training

Children

Habeas Corpus

Contact us

Links

Search

Site map

Library

**LOGIN FORM**

Username

Password

Remember Me ☐

Login

- Forgot your password?
- Forgot your username?

**Latest**

**Bhatt Murphy Solicitors : HOME SECRETARY ACTED UNLAWFULLY** - 17/04/12

**Guardian : "'He said he'd use a handkerchief to suffocate me'"** - 16/04/12

**Guardian : "Deportation contractor Reliance faces litany of abuse claims against staff"** - 16/04/12

**Guardian : "Staff deporting foreigners out of UK 'loutish and aggressive'"** - 16/04/12

**Open Democracy : "Routine neglect by UK government-contracted doctors brings torture victims fresh trauma"** - 16/04/12

**Popular**

"Outsourcing Abuse" report - 14/07/08
About making referrals to Medical Justice
Inquiry into the quality of healthcare at Yarl's Wood - 04/10/06
Medical Justice London
Medical Justice case-work

## Medical Justice Annual Report FY2011

FY2011 : financial year ending 31st January 2011. **Download the report.**

**The Medical Justice Max Appeal** - Transform our ability to produce **medical evidence of the toxic effect of immigration detention on health.** Financial appeal for Max, a computer system that will enable better case management of victims of torture and sick detainees. Max will deliver robust, independent evidence that can be used to defend the human rights of detainees and improve their circumstances. **Please donate,** thank you !



**"Fit to Fly"** : **a 10 minute film** about our work, including interviews with ex-detainees and the doctors who visited them in detention centres.

Ali, who took part in the 2009 demonstrations in Iran fled to the UK for safety and was detained. We arranged for a doctor to visit Ali in detention.

She wrote a report documenting his scars of torture. He was eventually released and granted refugee status. **Watch the film**



**"Denied & Detained"** - Most HIV+ immigration detainees helped by Medical Justice have been denied life-saving medication in detention according to our new research.



"Detained & Denied", based on the first ever comprehensive analysis of treatment of HIV+ immigration detainees in the UK draws on medical evidence from 8 independent clinicians who assessed the detainees. Many of the 35 men, women and children studied are torture survivors from countries where rape is used as a weapon of war.

Download "Detained & Denied"



**'State Sponsored Cruelty'**

Children in immigration detention

**"State Sponsored Cruelty"** - Key findings of this report : 41 cases are featured in this report involving children detained between 2004 and April 2010. These children spent a mean average of 26 days each in detention. One child had spent 166 days in detention, over numerous separate periods, before her third birthday. 48% of the children in this report were born in the UK.

74 children were psychologically harmed. Symptoms included bed wetting and loss of bowel control, heightened anxiety, and food refusal. 34 children exhibited signs of developmental regression, and six children expressed suicidal ideation either whilst in or after they were detained. Three girls attempted to end their own lives.

*"The fact that UKBA is still detaining children at Yarl's Wood despite announcements to the contrary raises serious questions about the consistency between the will of government and the actions of UKBA. The government must now show it is in control of UKBA. It must order and ensure the release of any detained children today and stop what the Deputy Prime Minister correctly refers to as 'state sponsored cruelty'. The dossier of evidence we are publishing brings to light the extent to which detaining children cases harm, suffering, and anguish. Children have attempted to end their own lives, and have been left seriously physically and psychologically damaged ".*

Jon Burnett, Medical Justice, author of **"'State Sponsored Cruelty': Children in immigration detention"**

1 of 3



Download the 'State Sponsored Cruely' report



"**Outsourcing Abuse - The use and misuse of state-sanctioned force during the detention and removal of asylum seekers**" by Birnberg Peirce & Partners, Medical Justice and NCADC describes an alarming number of injuries sustained by asylum deportees at the hand of private "escorts" contracted by the Home Office. It reveals evidence of widespread and seemingly systemic abuse and that assault claims have largely been brushed off by the Home Office. **Press release**

**About Medical Justice**
Medical Justice facilitates the provision of independent medical advice and independent legal advice and representation to asylum seekers detained in immigration removal centres. We also seek to negotiate changes to policy and practice within detention centres and publish our findings on the treatment of detainees. We have had some notable successes in those respects.

Medical Justice was established in October 2005 and its membership comprises highly skilled medical professionals, solicitors, barristers, ex-detainees and detention centre visitors. The national office for Medical Justice is located in London in addition to two regional branches in Oxford and Dover/Canterbury.

To download the Medical Justice booklet, **click here.**

> "The strength of a liberal democracy is measured not by how it treats the majority but by how it cares for minorities and those at the margins of society. The best tests for humanity and decency are conducted in its dark places: in prisons, psychiatric hospitals, and in institutions for failed asylum-seekers and other migrants"
> *Stephen Shaw, ex Ombudsman*

## What Medical Justice has found in Immigration Removal Centres

**Torture Victims** – neglected and re-traumatised by detention in the UK

**HIV** - unplanned disruption to their treatment in detention, denied HIV tests and results

**Hunger strikers** – detainees in imminent danger of organ failure

**Tuberculosis (TB)** – a number of detainees found to have TB and denied appropriate medical care

**Denial of treatment and access to hospital** – many detainees are denied treatment for serious medical conditions

**56 case-studies by Medical Justice**

Malaria – many children and pregnant women being deported to high risk malarial areas have **not been offered appropriate prophylaxis** or bed nets - **more info**

Depression and **suicide** – many detainees have Post-Traumatic Stress Disorder, self-harm and attempt suicide

**Harm on Removal** – detainees subjected to excessive and/or gratuitous force in the removal process with injuries including fractured bones, nerve damage and sexual assault

**Children in Detention** - the UK is the only EU country to indefinitely detain children, sometimes referred to by guards as "child male" and "child female"

**Death**

**Lack of legal representation for detainees**



## What Medical Justice achieved since it formed in October 2005

Some examples:



- Handled more than 500 **patients** in detention
- Conducted more than 125 medical visits into detention centres
- Written over 100 MLRs, professional statements and letters
- 75% of patients released after Medical Justice intervention
- Over 300 Medical Justice members
- Website and news-service
- **London office** and Medical Justice groups in Oxford and Kent
- **Literature for detainees** includes "Know Your Medical Rights"



- Lobbied for **HMIP Inquiry into healthcare at Yarl's Wood**
- HMIP inquiry findings echoed all of Medical Justice's main objectives
- Meeting and **Submission to the Parliamentary Joint Committee on Human Rights** (JCHR)
- A number of **Home Office** policy changes that make immigration detention less harmful
- Influenced registration of detention centre healthcare providers with the Healthcare Commission
- **Medical Justice articles in the British Medical Journal**
- Recent Media coverage includes - Channel 4 News, Radio 4, articles in **the New Stateman** and **Guardian.**



---

Background Information

**Responsibility for healthcare in Immigration Detention**

**How many men, women and children are indefinitely detained?**

**About healthcare provision in immigration detention**

**About healthcare provision for asylum seekers "in the community"**

© 2011 Medical Justice Network



4/27/2012 4:02 AM